We seek reversal of the trial court's wrongful grant of summary judgment. The first issue pertains to the Public Duty Doctrine and the court's erroneous conclusion that it applies to the facts and claims of this case. Because this is a diversity case, Iowa law applies. The Iowa Supreme Court has issued decisions on the Public Duty Doctrine in each of the last three calendar years, three times in three years, and in all three cases, the Iowa Supreme Court has overturned a lower court's granting of summary judgment or dismissal on the basis of the Public Duty Doctrine. Phelps and Breese, the first two cases, were decided before the trial court's decision. These should have been honored by the trial court, but instead were distinguished. But whatever doubt was left after Phelps and Breese should have been put to rest with the Farrell case, which was decided earlier this year and which was submitted to this court in the spring after it was issued and after the briefing was done. And the Iowa Supreme Court has said in these last three years we've narrowed the application of the Public Duty Doctrine, but unfortunately the trial court expanded its use to cover what happened in this case. What's indisputable from the last three Supreme Court decisions on this doctrine is that it is limited to cases in which the plaintiff's claim is that the government had negligently failed to intervene to prevent someone else's wrongful conduct or someone else's negligence or the consequences of it. It is not to be applied where the government itself was in control of the dangerous instrumentality, in this case, a high-voltage power line, or where the government itself creates the hazard as what happened here when the city installed and built and placed the power line that caused the electrocution of Victor Maldonado. In all the cases where the Public Duty Doctrine has been upheld, the government did not own the hazard involved. The government had nothing to do with the hazard being there in the first place. What is the alleged negligence? Is it the installation? And I forget the date. Decades ago, the power line. Is it the failure to update? Is it the failure to conduct appropriate investigations? What is pled here? What is pled here is that it was negligently, it was dangerously close to the rooftop where workers would be working, as was Mr. Maldonado on the day of the incident. That was installed negligently then? Yes. Yep. It was installed after the building, and it was put in dangerous proximity to where workers were known to be needed to do roughing work or install new gutters and downspouts, as was the case here. Well, everybody agrees, as I understand it, that it was installed consistent with the NESC. And certainly the trial court found that to be met essentially as a matter of law, okay? And we could try and win this case without the NESC whatsoever. But what got the trial court sidetracked is to elevate that single 1965 standard to the end-all and the be-all of the liability standards in this case. The NESC has been declared explicitly under the Iowa regulations to be a minimum standard, and the trial court's mistake was supplanting it as the only standard, and compliance with it would be exoneration. We argue that the later versions of the NESC are industry standards, and in fact, the city adopted a manual, an industry standard, years before this happened to Mr. Maldonado, in which it said the utility should strive to comply with the latest versions of the code. But isn't the industry standard that the wires need not be raised unless, for safety reasons, they're directed to do so by the utility board? No. That's not what the NESC said? The NESC grandfathered in a 1965 standard, okay? But that doesn't exonerate the city, should it happen to comply with it, because it had other duties. It's had common law duties to make its electricity distribution system safe for over 100 years. And it's had regulatory duties that say more than that, if you make this clearance, you're safe. I was just asking about industry standard. You said the industry standard was that the wires should have been higher. Yes. You cited the NESC from later years. And I was just asking, isn't it also the case that the NESC says that guidance doesn't apply to something that already exists unless the utilities board directs a change? Or if there's an upgrade. Yes, you're right, Your Honor. But you don't think compliance with the NESC is sufficient to show due care? We know it's not because of the Cronk case and the recent Johnson v. Interstate Power case, which explicitly held that industry standards, compliance with them, is insufficient to declare the entity non-negligent. How come you didn't cite the Johnson case for Judge Reed if it's such a great case? It doesn't seem very fair to her to bring that up for the first time in a reply brief at the Eighth Circuit. Well, actually, it was the defense that raised it, Your Honor, and we picked up on it and cited it in our reply brief. That's what I mean. It surfaced in the defense's brief. And in that case, the Supreme Court of Iowa – You should have cited it in the district court if you thought it was important. What about the Nelson case? Have you read that? I believe so, Your Honor. Nelson v. Iowa-Illinois Gasp. It's another one in the line of cases from Iowa. And that one goes the other way. It says it's difficult to conceive a better test of care than compliance with the NESC. And then the court held that as a matter of law, where that defendant had complied with the NESC, there was no negligence as a matter of law. So it's a little tricky, I'll grant you that, because you have Cronk, you have this Nelson case, you have this one paragraph in Johnson. But go ahead, what are your thoughts? Well, my concern is that we not conflate a breach of the standard of care for negligence, reasonable care, with the public duty doctrine. And what happened with the trial judge is he said, well, they complied with the NESC, therefore the public duty doctrine protects the city. And the public duty doctrine doesn't really have anything to do with compliance or noncompliance with the NESC. Wasn't she saying this is an alternative holding that even if the public duty doctrine does not apply? Yes. Oh, well, then it's not conflation. No. I understand. I thought we were still talking about the public duty doctrine. No, we've switched on to negligence. Very good, Your Honor. I understand. And it was an alternative ground of the trial court to declare that as a matter of law there was no evidence of breach. And in doing so, the trial court gave 100 percent credit to the defendant's evidence and zero percent credit to our countervailing evidence, including the fact that employees of the city's electric department agreed that the proximity of the line presented a potential hazard and a hazard. And under the Iowa Code, where there's a potential hazard or a hazard, the utility is obligated by regulation to address it timely. And here they had decades to do so, and they didn't raise the line until last year. And they did it for safety reasons, but it should have been done years ago. And so to pick up on your point, Judge Carlton, about whether or not the trial court had grounds to discredit our countervailing evidence, we say no. Under the summary judgment standard, she has to credit it. What was your evidence? You had an expert. I read the expert report, and he just said the later versions of the NESC have higher height requirements. Yes, and he said that the city failed to comply with 199-25.4, which said if you have a potential hazard, it has to be cured timely. And he declared that, in fact, this was a potential hazard, but we don't have to listen only to him. The city's electric department employees said that this was a hazard or a potential hazard, and that triggers an obligation to cure under the statute. And so it's not fair what the trial judge did is to say, well, look, if they complied with the 1965 clearance requirements and those got grandfathered in, that regulation pretty much trumps everything else. No, they have other obligations, and they're specified under the code. They have a general obligation under the Iowa Code to reduce the hazards that are associated. Which inspection found the hazard? Was there an inspection that you're citing, or are you just no? No, it's there. Well, the section you're referring to is entitled, Correction of Problems Found During Inspections. The one that's 25.4 that you just cited referring to potentially hazardous conditions, the title of that is Correction of Problems Found During Inspections. I just wondered if you were referring to an inspection or not. The city inspected, and the Iowa Utility Board inspected behind them periodically. They ignored this hazard. It is our claim, and we will prove at trial permitted, that in fact this was a hazard the whole time that they looked at it and didn't fill out any paperwork saying that this was a hazard. A city can't exonerate itself by negligently inspecting for hazards and then declaring there are none, which is essentially what they're saying here. And what the trial court bought, which was, Indeed, nobody said there was a hazard, so there must not have been one. We claim otherwise, and we have abundant evidence that, in fact, that's the case. The city adopted the American Power Association manual as its own safety policy, and in that manual it says you should strive to comply with the latest versions of the NESC, not the old ones. And so the fact that the city did nothing until after this happened is primitive evidence of breach, as we see it, Your Honor. Well, what's the point of the statute in the administrative code adopting the NESC then, under your view of it? Does it have any purpose? Oh, it simply sets afloat. It declares in implementation language. The only purpose of it is to create a negligence per se for a plaintiff in a legal sense? No, I think the purpose of enacting it and declaring it a minimum standard is they didn't want any utility going below it, and that's why they're declaring it to be a minimum standard. But minimum standard doesn't mean the only standard or the only, you know, or that there's compliance with this standard. Maybe that's right, but the purpose of the regulations is to provide standards for uniform and reasonable practices and to establish a basis for determining the reasonableness of demands made by the public upon utilities. So, query, what use is the code if it isn't defining what's reasonable? Well, I would say this in response, Your Honor. It can't be declared minimum and then simultaneously be declared good enough to meet the requirements of reasonable care when there are other provisions of the same code that say you've got to reduce the risk of electricity and use reasonable care in doing so, and you've got to correct potential hazards within a reasonable time. And so to elevate the clearance standard from 1965 is essentially to say that it trumps every other standard that might apply to the case, and Iowa law does not say that. And if it said that, then the Johnson v. Interstate Power case could not have been decided in the plaintiff's favor because in that case the Iowa Supreme Court said, okay, you complied with the clearance requirements of the code. That's only part of the picture, and that's what we're saying here. Where's the employer in this case? Has the employer been a defendant in this case? No, Your Honor. No. It's a comp case. You couldn't sue the employer anyway. Because it's a workers' comp. Yeah, exactly. You can't save any time for rebuttal? I can save you three minutes. Well, you're down to one minute. I'll stand down. You might want to save what's left. Thank you. Very well. Mr. Phillips, we'll hear from you. May it please the Court. My name is Doug Phillips, and I represent the City of Sibley. As the Court can see from the focus of the motion for summary judgment and the Court's ruling, it was the City's position all along that the public duty doctrine provides the resolution for this dispute. The Iowa Supreme Court recently wrote that the doctrine applies in cases when the government fails to enforce regulatory laws for the benefit of the general public, and that, we believe, is precisely what we have in this case. In the Fulp case, didn't the Iowa Supreme Court emphasize that it was to protect the general public from third-party harm or independent harm? In other words, that is not associated with alleged negligence of the City in this case? Actually, I believe the Court recognized for the first time that there wasn't a  It went on to give, as an example, what if a third party is the one who tripped over the defective sidewalk? The public duty doctrine didn't apply in that case, right? I mean, that was a sidewalk case. And there's so many cases, if I'm getting them wrong, just let me know. That is correct. I thought that was a sidewalk case, and the Supreme Court said, look, we're not There's no harm caused by a third party. This harm was caused by the City. I agree with the Court's reading of the case, but I think the basis for the decision was that it was misfeasance as opposed to nonfeasance. You can't own a sidewalk, have an ordinance-imposed duty to take care of the sidewalk, and just ignore it. Or that's misfeasance, and the public duty doctrine is of no avail to you as the government. The absence of a third person, I don't believe was, well, as I said, it was recognized as, I believe, the first case where those facts existed. But the reason for non-applicability was the finding of misfeasance. And each of the three cases that counsel referred to has attempted to clarify what those two words mean and why they're important in the application of the doctrine. Here, the City installed, maintained, and owned a power line. The plaintiff says that the City is negligent because there was not enough clearance. And accordingly, they argue that the doctrine does not apply. If we look at these three cases, first is Fultz that we just discussed where we've got a broken sidewalk owned by the City. The City was obligated under the ordinance to take care of, to repair its sidewalk. It failed to do so. And the court held that that's an example of misfeasance to which the doctrine does not apply. Why isn't that similar to here, assuming the City has the obligation to maintain the power lines, and at least for purposes of this case, they're alleging that they didn't do that, that they didn't maintain it just like they didn't maintain the sidewalk. So what's the key difference between the sidewalk case and this one? I think the primary difference is that in Fultz, there was no argument about the condition of the sidewalk, nor was there any argument about the City's ordinance-based duty to maintain the sidewalk. Whereas here, the City was in compliance with the regulation. What if the City weren't? What if the allegation was that they weren't in compliance with the NESC standards? Does that make it more like the sidewalk case? I believe that it does. If that power line was seven feet above the roof, then we've got a defective sidewalk and a similar. You seem to be conflating the two issues then. I'm sorry? You seem to be conflating the two issues then. You seem to be saying if the City were negligent, then the public duty doctrine would not apply. But you're saying here the City was not negligent and so the doctrine does apply. But I didn't think the doctrine would turn on the merits. It doesn't. It turns on the absence of a duty to Victor Maldonado. The duty that exists, it's clearly stated in the regulations, is a duty to the public. So you're saying even if the line were only seven feet high, under that rationale, the public duty doctrine would still apply, as I understand what you just said, because there was no duty to Maldonado. Correct. So I'm getting myself a bit confused. Distinguish that from the sidewalk case then, because the duty there is owed to the public as well, isn't it? Not based on the holding of the court. False. That may suggest your interpretation of this case is off, because I have a I mean, clearly the sidewalk duty, it seems to me, is owed to the public. And under your explanation, false was wrongly decided. False court decided that because this was an example of misfeasance, the plaintiff had a personal injury claim against the city. I don't know that the holding can be expanded beyond that. I'll grant you they're confusing cases, so I'm still thinking about them. Well, what do you have to say about the alternative holding of Judge Reed, that there was no negligence? What do you have to say about the arguments that even if you complied with the NESC, that isn't determinative? First of all, to answer the last question first, I disagree with that statement. The legislature authorized the Utilities Board to promulgate standards. The Utilities Board did that by adopting the NESC. The NESC is the law. If this case were to go to trial tomorrow, the judge would instruct the jury, based on what the NESC says, and inform the jury that a violation of the standard is negligence. And so with that in mind, we have an installation that complied with the law when it was installed. It was still in compliance when this accident happened. There is a provision in the code that says as long as you put it in right to begin with, you don't have to raise the height if we change the standards for new installations or upgraded installations. And so, yes, I agree with the holding by the district court that there was . . . Now let me ask you this. What is the record on what notice the city had, if any, about a workman being in that location? At least one city employee testified that he saw garbage cans around the building, indicating that something was going on. What about any notice of somebody being up on the roof? None. No notice of that? No. There is a fact dispute about whether the owner of the building approached the city clerk, said, we're going to be doing some work on this building. Do you have garbage cans, dumpsters that we can rent? The clerk doesn't deny that happened but doesn't remember it. The owner has signed an affidavit saying that's what we talked about. Talking about getting garbage cans for work at the building? Yes, and so applying the summary judgment standard, we have to accept that we knew that much. But that doesn't mean we knew somebody was working on the roof or working in proximity to that wire. The evidence in the record does indicate that had they only said, we're going to put a gutter in on that side where that wire is at, we would have wrapped the wire so none of this would have happened. That's what one of your witnesses says? Yes. As it relates to this question of whether the provision that if it's hazardous, you've got to change it without regard to compliance with the clearance requirement. The testimony of the electric department witnesses, indeed, is that yes, that's a potential hazard. Namely, stay away from it with a 20-foot aluminum downspout. I assume they would have said it was a potential hazard even if it was higher. Yes. It's always a potential hazard if you contact it with metal. The reason I bring that up is for that very point. Every wire in the community, every wire on the planet is a potential hazard. I don't think that's exactly what the regulations are referring to when they address this question of a hazardous installation. But I do think that the critical thing that's missing here is that in the course of the many inspections by the Utilities Board, never once is there a discussion about whether or the extent to which this installation is a hazard. Without that, I don't believe that the argument gains any traction. Do you want to say anything about this case, Johnson, against interstate power, which was, I guess, mentioned in your brief for a different proposition but now featured by the plaintiff in the reply brief for the first time? Yes, thank you. What I want to say is I find it even more confusing than the series of cases on the public duty doctrine. The reason why I'm confused is, first of all, the experts who testified at trial in that case disagreed about whether the 1973 standard had been met. Apparently, as a result of that disagreement, counsel for the power company cross-examined the plaintiff's expert about some provision of the 1977 code provision, which apparently has higher clearance standards, and then on redirect, when the plaintiff's attorney questioned his own expert, he offered the 1977 code provisions that the other attorney had asked about, and in response to that, the power company's attorney says, not only does he not object, but he wants the record. Well, I know all of that and they open the door and so forth, but then there's this last paragraph that the plaintiff here cites, which says that It's admissible and relevant. Yeah, that's the part I thought you might want to address. They can't use it for negligence per se, but they can use it as evidence of negligence, and I do not understand that comment or why it was necessary to a resolution of the issue of whether the power company's attorney had opened the door to the admissibility of the 1977 code. That is the part that confuses me. What's your best case that violation of a regulation or compliance with a regulation is conclusive on the issue of duty of care? What's the best Iowa case you have on that? It says, look, if we follow the regulation, we're not negligent. I can't give you the name of a case. So the argument is based instead that the State has adopted these, formally adopted these, and that as such, by implication, I guess, they are conclusive? They are the standard that we must meet, and having done so, we've complied with the law. You might look at this Nelson case. It's not cited by anybody, and it's from 1968, but it arguably would support that proposition. That's what we'll have to figure out. It comes between Kronk and Johnson, though. And I would have to review the timeline. Kronk was clearly decided before Iowa adopted the NESC. Yeah, so is this Nelson case, but then Johnson is after, as I recall. Yes, Johnson was clearly after. I see that I am out of time. Thank you. Thank you. All right. Thank you for your argument. Mr. Conlon, you have a little bit of time remaining. Thank you, Your Honor. I'll be as brief as I can be. I think one takeaway from the exchange between the Court and counsel today is that this case is not really fit for summary judgment, given the disputing evidence on whether the city exercised reasonable care or not. The trial court took a single minimum standard and made it the only standard in the process through the reasonable care standard out the window. On the public duty doctrine, the Farrell case says that the negligence of the driver in that case does not intervene to allow application of the public duty doctrine. Well, what the trial judge did in this case is to say the intervening negligence of the employer serves to elevate this case to the application of the public duty doctrine. Farrell absolutely disputes that proposition. On the point about whether or not the city was on notice, we presented evidence in the trial court. City employees testified that it was foreseeable that workers would be on the roof and in proximity to that line. Finally, two points. The distinction between the duty owed to the public and the special relationship, which Judge Reedy addressed in her trial court decision, that applies according to Phelps and Breese and Farrell, that applies only as one last chance for a plaintiff who's subjected to a public duty doctrine. It doesn't play into the initial evaluation of whether the public duty doctrine applies at all. And if someone wanted to reimagine this Maldonado case in a way that would justify the public duty doctrine, it would look like this. Xcel Energy owned the power line which injured Mr. Maldonado, and we are suing the city for negligent inspection and failure to enforce its regulations. That's not this case. In this case, the city owned the dangerous instrumentality. They maintained it. They installed it. They put that wire where it was. Very well. Thank you. Thank you for your argument. The case is submitted. The court will file a decision in due course. Thank you to all counsel. You are excused.